UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 18-cr-00079-01 |
| VERSUS | JUDGE FOOTE |
| MARLON G. GLADNEY | MAGISTRATE JUDGE HORNSBY |

**ORDER**

For the reasons assigned in the Report and Recommendation of the Magistrate Judge previously filed herein, and having thoroughly reviewed the record, including the written objections filed, and concurring with the findings of the Magistrate Judge under the applicable law, it is ordered that Defendant's motion to suppress [Record Document 26] is **DENIED**.

The Court makes a few additional observations regarding the Magistrate Judge's findings as to the first step of the Terry v. Ohio, 392 U.S. 1 (1968), analysis; that is, whether Trooper Titus's action of stopping Marlon Gladney's ("Gladney") vehicle was justified at its inception.[1] Louisiana Revised Statute 32:125(B)(1) provides, in pertinent part:

> When any vehicle making use of any visual signals as authorized by law, including the display of alternately flashing amber or yellow warning lights is parked on or near the highway, the driver of every other vehicle shall . . . [w]hen driving on an interstate highway or other highway with two or more lanes traveling in the same direction, yield the right-of-way by making a lane

---

[1] While Gladney also seemingly objects to the Magistrate Judge's findings on Terry's second prong, his objection to the Report and Recommendation provides no reasons or argument to support his position on that issue. See Record Document 38, p. 7.

change into a lane not adjacent to the parked vehicle, if possible with due regard to safety and traffic conditions. If a lane change is not possible, the driver shall slow to a reasonably safe speed.

La. R.S. 32:125(B)(1). This statute is the basis of Gladney's traffic stop by Trooper Titus.

In the Report and Recommendation, the Magistrate Judge reasoned that "Trooper Titus reported that the car passed him in the closest lane while his light bar was illuminated to direct traffic into the left lane. This is a violation of La. R.S. 32:125. Defendant testified that traffic was heavy and that he could not move over, but Defendant's testimony is not credible." Record Document 36, p. 4. Gladney's objection to the Report and Recommendation criticizes this finding, repeatedly asserting that Trooper Titus's testimony at the suppression hearing failed to address "whether or not a lane change was possible," and that the "only evidence" on this point came from Gladney's own testimony wherein he testified that he was unable to change lanes due to multiple vehicles in the left lane. Record Document 38, p. 3. Gladney contends that because Trooper Titus failed to determine whether a lane change was possible at the time of the actual traffic stop, the stop amounted to a mistake of law which rendered it illegal under the Fourth Amendment.

Following a thorough review of the record, the Court finds that Gladney's objection misrepresents the evidence adduced at the suppression hearing. Contrary to what Gladney now avers, Trooper Titus directly contradicted Gladney's testimony regarding the existence, or lack thereof, of traffic in the left lane of the interstate:

> Q: Okay. And so where, where did his vehicle– where was his vehicle located when it passed your vehicle?
>
> A: It was traveling in the right lane directly next to mine.

> Q: Were there any other vehicles in the left lane at the time that you observed Mr. Gladney's vehicle pass yours?
>
> A: No.

Record Document 43, p. 14

Contrary to Gladney's post-hearing misrepresentations of the testimony at the suppression hearing, the evidence established that, according to Trooper Titus, there was no traffic in the left lane when Gladney passed the Trooper's vehicle; this fact objectively established reasonable suspicion that a violation of La. R.S. 32:125 had occurred. Disputing Trooper Titus's testimony, Gladney testified at the hearing that he was unable to move to the left lane of the interstate while passing Trooper Titus. Hence, the Magistrate Judge was faced with contradictory accounts of the interstate conditions and chose to credit the testimony of Trooper Titus over that of Gladney.

The Court agrees with this decision, in light of inconsistencies within and omissions from Gladney's version of events. The video of the traffic stop shows that when Gladney was asked why he did not move over to the left lane in response to the directional arrow, he told Trooper Titus that he did not know that was even the law. However, at the suppression hearing, Gladney seemingly abandoned that particular defense, and instead testified that he simply did not see the directional arrow, implying that the directional arrow never existed in the first place. While Gladney's change in course is nuanced and potentially subject to interpretation, it was not unreasonable for the Magistrate to find that Gladney's credibility had been undercut.

Further harming Gladney's credibility were his omissions during testimony. He testified repeatedly that on the day of the traffic stop, he was simply making a round trip drive from Texas to the DMV in Louisiana in order to rectify his suspended driver's license. Defense counsel asked Gladney, "what was your plan? Was it to go to the DMV and then go back to Dallas?" Record Document 43, p. 40. Gladney responded, "Yes. It was a turn-around trip." Id. On cross-examination, Gladney reiterated the same itinerary.

> Q: [Y]ou indicated that you were going to the DMV that day?
>
> A: That's right.
>
> Q: And you were coming back from the DMV. That's all you were doing?
>
> A: I was going to the DMV to get my license and I was making a round trip to go back to Dallas, correct.

Id. at pp. 46-47. However, Gladney's cross-examination later revealed that he was not simply going to the DMV for the sole purpose of curing his suspended license, as he testified, but rather had plans to meet with Erin O'Daniel ("O'Daniel") regarding a methamphetamine transaction. The facts are controverted regarding whether Gladney intended to meet O'Daniel at the DMV to exchange "bad" methamphetamine or whether O'Daniel was to meet Gladney at the DMV to provide money for methamphetamine. However, the details of the planned meeting are irrelevant. What is relevant is that Gladney had planned to meet O'Daniel at the DMV for a drug deal, yet he omitted all of that information from his testimony to the court. That critical omission manifested a lack of candor and truthfulness, which further supported the Magistrate Judge's decision to

credit Trooper Titus's testimony over Gladney's.  The Court agrees with and adopts the Magistrate's Judge's findings in this matter.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this the ____ day of October, 2018.

                                                                _____
                                                                ELIZABETH E. FOOTE
                                                                UNITED STATES DISTRICT JUDGE